2019 IL App (3d) 160631

Opinion filed March 18, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Henry County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-16-0631 Circuit No. 15-CF-0236 |
| | ) | |
| DANYEL B.J. SMITH, | ) ) | Honorable Jeffrey O'Connor, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice Lytton concurred in the judgment and opinion.
Justice McDade specially concurred, with opinion.

**OPINION**

¶ 1     Defendant, Danyel B.J. Smith, appeals his convictions for predatory criminal sexual assault of a child and aggravated kidnapping. Defendant argues the admission of a recording of the victim's interview at a child advocacy center (CAC) violated his right to confrontation. Specifically, defendant argues that the victim was unavailable for cross-examination because she testified that she did not remember the events constituting the offense of predatory criminal sexual assault of a child. Defendant also argues that his mandatory sentence of life imprisonment was unconstitutional as applied to him because he is intellectually disabled. We affirm.

## I. BACKGROUND

¶ 3    Defendant was charged with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)) in that he placed his penis in the mouth of J.H. The information alleged that defendant was 17 years of age or older at the time of the offense and J.H. was under 13 years of age. Defendant was also charged with aggravated kidnapping (*id.* § 10-2(a)(2)) in that he knowingly and secretly confined J.H. against her will.

¶ 4    The State filed a motion for a hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2014)). The State sought a ruling that J.H.'s recorded interview at the CAC would be admissible if J.H. testified and was subject to cross-examination. After a hearing, the court ruled that the recording of the interview would be admitted into evidence as an exception to the hearsay rule pursuant to section 115-10 of the Code.

¶ 5    The matter proceeded to a bench trial. James Bina testified that he was at an auction on the date of the incident with his granddaughter, J.H., and his grandson, A.H. J.H. was seven years old, and A.H. was eight years old. Bina lost sight of J.H. and A.H. while he was looking at lumber. J.H. and A.H. were playing near some campers at that time. Bina began looking for the children and found A.H. hiding. A.H. told Bina that J.H. was in a camper with "some guy." Bina touched the doorknob of the camper, and he heard a man say not to come inside. Bina entered the camper. Bina saw a man lying on a bed inside the camper. Bina identified defendant as the man. J.H. was lying alongside defendant's left leg. J.H. was not wearing any clothing. Defendant had his left hand behind J.H.'s head, and he was holding her head down. Bina could only see J.H.'s hair and defendant's hand on the back of her head, but Bina said that J.H.'s head "had to have been down on him, on his privates." Bina pulled J.H. off defendant, and he saw that defendant's

2

pants were down. Defendant's penis was exposed and erect. Bina told defendant not to move. Bina grabbed some of J.H.'s clothing and told her to get dressed. While Bina was trying to help J.H. find her clothing and call 911, defendant exited the camper.

¶ 6    Defendant began running away, and Bina chased him. Bina stopped because he did not want to get too far away from the children. Bina was speaking to a 911 operator on the phone while he was chasing defendant. A recording of the 911 call was admitted into evidence and played in court. On the recording, Bina was yelling at people to stop defendant. Bina told the 911 operator that a man had molested his granddaughter, and he described the man's appearance. Eventually, Bina met with a police officer. The officer asked Bina to identify defendant. Bina had no doubt that defendant was the man he saw in the camper.

¶ 7    J.H. testified that she was at the auction with Bina and A.H. on the date of the incident. While Bina was looking at things, J.H. and A.H. walked around and looked at "stuff." When they were looking at something, a man approached them and said that they could not play on it. The man started following J.H. and A.H. He asked if they knew where the bathroom was. He then went to the bathroom. He returned to where J.H. and A.H. were located. He asked J.H. and A.H. if they " 'want[ed] to see something cool,' " and they said yes. The man showed them a camper. The man said that the thing in the camper was just for J.H., and he made A.H. wait outside.

¶ 8    Inside the camper, the man showed J.H. around. He then covered her mouth and told her to remove her clothes. She told the man that she was scared. J.H. removed her clothing. The prosecutor asked J.H. what happened next. J.H. replied, "I don't remember that stuff." The prosecutor asked J.H. if she had ever talked about it with someone else, and J.H. said no. The prosecutor asked J.H. if she remembered talking to a lady about what happened, and J.H. said yes. The prosecutor asked J.H. if she remembered what happened next after the things she did

3

not remember. J.H. said that her grandfather came in, said a bad word, and called the police. The man ran out of the camper. The police came, and they all looked for the man. J.H. said defendant looked like the man from the camper.

¶ 9    Defense counsel requested to wait to conduct his cross-examination of J.H. until after the recording of J.H.'s interview at the CAC had been played. The court admitted the recording over defense counsel's objection, and it was played in open court.

¶ 10    In the recorded interview, J.H. said that she and her brother were looking at stuff. A man approached them and told them that they should not be on something. The man kept following J.H. The man asked where the bathroom was. He left and then returned. The man asked J.H. if she wanted to see something "cool." The man took J.H. into a trailer attached to a truck. The man said that the cool thing was only for J.H., so her brother waited outside. The man showed J.H. around the trailer. He put his hand over her mouth and told her that she was dead if she screamed. She did not know if he would kill her, so she did what he told her to. The man brought J.H. to a bed. The man told J.H. to remove her clothing. She told the man she was scared, but he said it would be okay. J.H. removed her shirt, and the man removed the rest of her clothing. The man unzipped his pants and exposed his penis. The man tried to insert his penis into J.H.'s "privates." She told him it hurt. He asked if it was inside of her, and she said no. The man also tried to insert his penis into J.H.'s "butt." The man then told J.H. to "suck on his d***," and she did. J.H.'s grandfather entered the trailer, said a bad word, and called the police. The man ran away. J.H. saw him later and recognized him.

¶ 11    During cross-examination, defense counsel asked J.H. questions about watching the recording of the interview previously, whether she had discussed the case with anyone, what defendant was wearing at the time of the incident, and whether J.H. saw defendant getting in

4

trouble with his mother after the incident. Defense counsel did not ask any questions about the incident itself. J.H. answered all of defense counsel's questions.

¶ 12 Four witnesses testified that they were at the auction on the day of the incident. They all saw a man running and heard another man yell to stop him. They all later identified defendant as the man they saw running.

¶ 13 Detective Jim Kessinger testified that he interviewed defendant in connection with the instant case. The interview was recorded. The recording was admitted into evidence, but it was not played in court. The judge said that he had listened to the interview at a pretrial hearing and he did not need to hear it again.

¶ 14 In the recording, defendant said that he, his mother, and his stepfather were at the auction on the day of the incident. They had looked at the recreational vehicle (RV) where the assault occurred, and they were considering purchasing it for defendant to live in. Defendant later returned to the RV to look for a book that he had lost. As he exited the RV with his book, he saw a little girl enter the RV with another man. The girl appeared to be approximately five or six years old. Defendant also saw a child that appeared to be the girl's brother. Defendant said that he did not touch the girl. Defendant denied speaking to any children at the auction. Defendant said that he tried to stay away from children because he did not want his parole to be revoked. Defendant said that he did not run at any point at the auction. He explained that he was in bad physical shape and had asthma.

¶ 15 Maureen Hofmann testified that she was a nurse at a children's hospital. Hofmann performed a sexual assault evaluation on J.H. on the date of the incident. Hofmann observed that J.H. had bruising on her genitals and a small abrasion on her anal area. J.H. told Hofmann that a man with a semi truck was following her around and asked her if she wanted to see something

cool. The man put his hand over J.H.'s mouth and told her to remove her clothing. J.H. said the man "tried to put his body part inside [her]." J.H. told the man it hurt, and the man then told her to "[s]uck on it."

¶ 16        The State rested.

¶ 17        The defense called Dr. Kirk Witherspoon, a clinical psychologist, as an expert witness. Witherspoon had evaluated defendant pursuant to a court order to determine if defendant was insane, mentally ill, or suffering from any mental disease or defect such that it might constitute a legal defense to the charges. Witherspoon testified that he reviewed the discovery in the case, spoke with defendant's mother, and scheduled an appointment with defendant. Witherspoon did not obtain any medical records other than defendant's medication list from the jail.

¶ 18        During his appointment with defendant, Witherspoon administered a mental status examination and a measure of defendant's reading ability. Witherspoon also administered the Rogers Criminal Responsibility Assessment Scale, which concerns whether an individual might be compromised cognitively or behaviorally at the time of an offense or afterward. Witherspoon also administered the Miller Forensic Assessment Screening Test, which gauged malingering.

¶ 19        Witherspoon opined that defendant was not eligible for an insanity defense because he did not find anything supporting that defendant was irrational or psychotic. Witherspoon opined that defendant likely had an "executive disorder or frontal lobe disorder." Witherspoon explained that defendant likely acted impulsively without sufficient forethought, planning, and judgment. Witherspoon stated that defendant had a very short attention span, "which suggested difficulty multitasking and likely contemplating consequences for his behavior." However, nothing rose to the level of insanity.

¶ 20     Witherspoon opined that defendant "could be a viable qualifier" for a finding of guilty but mentally ill. Witherspoon noted that defendant had "severe mental problems, including epilepsy which suggest[ed] compromised brain functioning." Witherspoon stated that he had learned that defendant had been diagnosed with schizophrenia and bipolar disorder. Witherspoon could not recall whether he had learned that information from defendant's mother or from another source. When presented with an e-mail from defendant's attorney, Witherspoon acknowledged that he had learned from defendant's attorney that defendant had bipolar disorder, schizophrenia, and posttraumatic stress disorder (PTSD). Witherspoon stated that he did not see evidence of defendant having schizophrenia or PTSD, but the diagnosis of bipolar disorder was "upheld."

¶ 21     While Witherspoon believed that there was some evidence that defendant had pedophilic disorder, he did not have sufficient information to make that diagnosis. Witherspoon said that behaviors consistent with pedophilic disorder could be due to other disorders, including bipolar disorder, brain damage, an intellectual disability, and alcoholism.[1]

¶ 22     The court found defendant guilty of predatory criminal sexual assault of a child and aggravated kidnapping. The court declined to find defendant guilty but mentally ill. The court reasoned that defendant "knew what he was doing." The court noted that defendant chose the premises for the sexual assault, had A.H. wait outside, made deliberate choices as to what to do, and ran away when Bina arrived.

¶ 23     A presentence investigation report (PSI) was prepared. The PSI showed that defendant had a prior conviction for aggravated criminal sexual assault of a victim under nine years old.

_____

[1]Witherspoon used the term "mental retardation" during his testimony. However, "that term is no longer the preferred nomenclature." *People v. Coty*, 2018 IL App (1st) 162383, ¶ 1 n.1. Accordingly, we use the term "intellectual disability" rather than "mental retardation" throughout this opinion.

Defendant was a juvenile at the time of the offense, but he was tried as an adult. Defendant was found guilty but mentally ill and sentenced to 10 years' imprisonment. Defendant was released from prison in October 2013, and he was on parole at the time of the instant offense.

¶ 24    Medical records concerning defendant's mental health issues were attached to the PSI. The records showed that defendant was diagnosed with various mental health disorders, including, *inter alia*, schizoaffective disorder and bipolar disorder. Defendant was also diagnosed with attention deficit hyperactivity disorder. Dr. Witherspoon's written psychological evaluation was also attached to the PSI.

¶ 25    The court sentenced defendant to natural life imprisonment for predatory criminal sexual assault of a child, which was mandatory based on defendant's prior conviction for aggravated criminal sexual assault. The court sentenced defendant to 20 years' imprisonment for aggravated kidnapping, to be served consecutively with his sentence for predatory criminal sexual assault of a child.

¶ 26                                    II. ANALYSIS

¶ 27                              A. Confrontation Clause

¶ 28    Defendant argues that his right to confront his accusers was violated in that the recording of J.H.'s interview at the CAC was admitted into evidence but J.H. was unavailable for cross-examination. Specifically, defendant contends that J.H. became unavailable as a witness when she testified at trial that she could not remember the portion of the incident that comprised the offense of predatory criminal sexual assault of a child. We find that J.H. appeared for cross-examination within the meaning of the confrontation clause and, consequently, the admission of the recording of the CAC interview did not violate the confrontation clause.

¶ 29        Defendant concedes that he failed to preserve this issue at trial by failing to object to the admission of the recording of the CAC interview on the basis that it violated his confrontation rights. However, defendant requests that we review this issue under the plain error doctrine and argues that his counsel was ineffective for failing to preserve the issue. Before addressing defendant's forfeiture arguments, we consider whether the court erred in admitting the recording of the CAC interview.

¶ 30        Both the United States Constitution and the Illinois Constitution guarantee a criminal defendant the right to confront his or her accusers. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. [Citation.] *** The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004). "In general, a witness is considered to be present, available for, or subject to cross-examination when the witness takes the stand, is placed under oath, [and] willingly answers questions, and the opposing party has an opportunity to cross-examine the witness." *People v. Dabney*, 2017 IL App (3d) 140915, ¶ 19. "[T]he key inquiry in determining whether the declarant is available for cross-examination is whether the declarant was present for cross-examination and answered all of the questions asked of him or her by defense counsel." *Id.*

¶ 31        "Where the declarant appears for cross-examination, even where the declarant does not testify to the substance of his hearsay statement, its admission is a nonevent under the confrontation clause." *People v. Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 66. Many Illinois cases have held that child victims of sex offenses were available for cross-examination for purposes of the confrontation clause where they testified at trial and answered the questions

9

posed to them during cross-examination even if they were unwilling or unable to testify as to some or all of charged conduct. See *Dabney*, 2017 IL App (3d) 140915, ¶ 20 (collecting cases).

¶ 32    "[A] gap in the witness' recollection concerning the content of a prior statement does not necessarily preclude an opportunity for effective cross-examination." *People v. Flores*, 128 Ill. 2d 66, 88 (1989). "There are no confrontation clause problems merely because the witness's memory problems preclude him from being cross-examined to the extent the parties would have liked." *People v. Leonard*, 391 Ill. App. 3d 926, 934-35 (2009).

¶ 33    In the instant case, J.H. was available for cross-examination for purposes of the confrontation clause. She took the witness stand and willingly answered the questions posed to her by the prosecutor and defense counsel. She answered every question asked of her during cross-examination. Although she testified that she could not remember what happened between the time she removed her clothing and the time her grandfather entered the camper, her lack of memory did not render her unavailable for cross-examination. See *Flores*, 128 Ill. 2d at 88; *Leonard*, 391 Ill. App. 3d at 934-35.

¶ 34    We reject the assertion in defendant's brief that being available to defend or explain a prior statement for purposes of the confrontation clause is a "term of art that means that the witness's direct testimony, standing alone, is sufficient to establish the elements of the relevant counts with which a defendant is charged." Defendant cites *People v. Kitch*, 239 Ill. 2d 452, 464 (2011), in support of this proposition. However, we do not read *Kitch* to stand for such a broad point. The *Kitch* court found that the testimony of the two victims provided enough detail to allow for cross-examination within the meaning of the confrontation clause where the victims' direct testimony, standing alone, was sufficient to establish the relevant charges against the defendant. *Id.* at 464. *Kitch* was decided on its facts, and we do not interpret *Kitch* to assert a rule

10

requiring that a victim's testimony must be sufficient to establish every element the charges against a defendant in order to allow for sufficient cross-examination under the confrontation clause. *Kitch* did not overrule *Flores* or other cases holding that a witness was subject to cross-examination within the meaning of the confrontation clause where the witness could not remember the content of his or her prior statement. See *Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 56 ("*Kitch* did not involve memory loss and did not touch upon the cases dealing with memory loss").

¶ 35    We also reject defendant's reliance on Illinois Rule of Evidence 804(a)(3) (eff. Jan. 1, 2011) for the proposition that a witness is unavailable as a matter of law where the witness testifies to a lack of memory of the subject matter of the statement. Rule 804 concerns certain exceptions to the rule against hearsay that are applicable where a declarant is "unavailable as a witness." Ill. R. Evid. 804 (eff. Jan. 1, 2011). To be sure, the definition of unavailability in Rule 804 applies when analyzing the admissibility of hearsay statements pursuant to the exceptions outlined in the rule. However, Rule 804 does not concern availability for cross-examination under the confrontation clause. Defendant has cited no authority to support the proposition that the definition of unavailability in Rule 804 applies in the context of an alleged confrontation clause violation. We reassert that our supreme court has held that "a gap in the witness' recollection concerning the content of a prior statement does not necessarily preclude an opportunity for effective cross-examination" for purposes of the confrontation clause. *Flores*, 128 Ill. 2d at 88.

¶ 36    We also note that defendant relies on *People v. Learn*, 396 Ill. App. 3d 891, 899-900 (2009), for the proposition that a victim does not testify for purposes of the confrontation clause when the victim's testimony is not incriminatory. As we stated in *Dabney*, "we respectfully

11

disagree with the conclusion reached by the appellate court in that case and do not believe that it reflects the current state of the law on this issue." *Dabney*, 2017 IL App (3d) 140915, ¶ 21; see also *In re Brandon P.*, 2013 IL App (4th) 111022, ¶ 44 (noting that much of the Illinois judiciary had distanced itself from *Learn* and that no court has cited it approvingly).

¶ 37    In the special concurrence, it is asserted than an accusation is neither a certainty nor is it proof of wrongdoing. *Infra* ¶ 58. Contrary to that assertion, evidence of an accusation, if accepted by the fact finder as credible, is proof of wrongdoing. See *People v. Smith*, 185 Ill. 2d 532, 541 (1999) ("The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict."). In this case, the victim's accusation via the video recording was subject to cross-examination under the applicable case law. See, *e.g.*, *Dabney*, 2017 IL App (3d) 140915, ¶ 20 (collecting cases).

¶ 38    As we have found that no violation of the confrontation clause occurred, defendant may not obtain relief under the plain error doctrine. *People v. Lopez*, 2012 IL App (1st) 101395, ¶ 64 ("If there was no error in the first instance, there can be no plain error."). Also, defendant did not suffer prejudice as a result of counsel's failure to raise the confrontation clause issue because a confrontation clause challenge would not have been successful. See *People v. Domagala*, 2013 IL 113688, ¶ 36 ("To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant."). Thus, defendant may not obtain relief based on a claim of ineffective assistance of counsel.

¶ 39                                    II. Constitutionality of Sentence

¶ 40    Defendant argues that his mandatory sentence of natural life imprisonment violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the

12

Illinois Constitution as applied to him because he is intellectually disabled. Defendant contends that the intellectually disabled are comparable to juveniles for constitutional purposes in the context of sentencing. Accordingly, defendant argues that the same constitutional protections applicable to juveniles should apply with equal force to the intellectually disabled.

¶ 41      Defendant relies on the First District's recent decision in *People v. Coty*, 2018 IL App (1st) 162383, in support of his argument. The *Coty* defendant was convicted of predatory criminal sexual assault of a child. *Id.* ¶ 1. Testimony from two psychologists at a fitness hearing established that the defendant was intellectually disabled. *Id.* ¶¶ 7-15. The defendant was ultimately sentenced to 50 years' imprisonment. *Id.* ¶ 46.

¶ 42      The *Coty* court held that the imposition of a *de facto* life sentence on an intellectually disabled offender without taking into account the characteristics accompanying an intellectual disability violated the proportionate penalties clause. *Id.* ¶ 75. The *Coty* court reasoned that adults with intellectual disabilities should be treated similarly to minors in an analysis under the proportionate penalties clause of the Illinois Constitution. *Id.* The *Coty* court relied on the decisions in *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), *Miller v. Alabama*, 567 U.S. 460, 489 (2012), and *People v. Reyes*, 2016 IL 119271, ¶ 9, in support of its holding. The *Coty* court noted that the United States Supreme Court's line of eighth amendment jurisprudence concerning sentencing for juveniles began with its concern for the intellectually disabled in *Atkins*. *Coty*, 2018 IL App (1st) 162383, ¶ 69.

¶ 43      Relying on the reasoning in *Coty* and the Court's holding in *Graham v. Florida*, 560 U.S. 48, 82 (2010), defendant argues that the matter must be remanded so that he may be resentenced to a survivable sentence that takes his individual characteristics into account.

¶ 44    "All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge." *People v. Harris*, 2018 IL 121932, ¶ 39. Accordingly, "it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *People v. Thompson*, 2015 IL 118151, ¶ 37. " 'A court is not capable of making an "as applied" determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional "as applied" is premature.' " *People v. Mosley*, 2015 IL 115872, ¶ 47 (quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 45    We find that the record in this case is insufficient to address defendant's as-applied constitutional challenge. Defendant did not raise his as-applied challenge in the trial court, and the trial court did not make any findings of fact regarding the as-applied challenge. Critically, the record in this case does not establish that defendant did, in fact, suffer from an intellectual disability. The record contains no indication of defendant's intelligence quotient or a formal diagnosis of an intellectual disability. While Dr. Witherspoon's written evaluation stated that defendant's intellectual functioning seemed borderline, Witherspoon did not state in his written report or in his testimony that defendant had an intellectual disability.

¶ 46    We reject defendant's argument that the record established that he suffered from an intellectual disability. Defendant notes that Witherspoon reported in his written evaluation that defendant's basic reading score was at an eighth-grade level, and his reading comprehension was at a sixth-grade level. Witherspoon also reported that defendant failed to answer several basic math problems correctly and his concentration was poor. Defendant also notes that his mother reported to Witherspoon that defendant took special education coursework and was always two

14

or three years behind in academic and motor skills. Additionally, defendant notes that he reported to Witherspoon that he had never been employed and received disability benefits. Defendant also reported that he did not drive, shop, cook, or clean. While the above information could be consistent with an intellectual disability, it does not definitively establish that defendant suffered from an intellectual disability. Without evidence directly establishing that defendant suffered from an intellectual disability, it is impossible to determine whether the above issues were actually caused by an intellectual disability.

¶ 47 Defendant also notes that his mother told a detective in a recorded interview that defendant had "mental issues" and "pretty much he's like taking care of a baby."[2] Also, in Witherspoon's written evaluation, defendant's mother reported that defendant had always been " 'mentally challenged.' " Defendant's mother's statements that defendant had "mental issues" and was " 'mentally challenged' " are ambiguous and could have been referring to defendant's issues with schizoaffective disorder and bipolar disorder rather than an intellectual disability. We note that defendant's history of mental health problems were well documented by the medical records attached to the PSI.

¶ 48 Defendant also notes that in a recording introduced as an exhibit at a pretrial hearing, one of the eyewitnesses at the auction told a detective that he believed defendant had a "mental disability" based on the way he talked. However, the belief of a lay witness that defendant had a "mental disability" does not establish that defendant suffered from an intellectual disability.

¶ 49 While the record in this case suggests that defendant may have an intellectual disability, it falls short of establishing that he does. Accordingly, it would be premature to address

---

[2]At a pretrial hearing on defendant's motion to suppress identification, defendant requested to admit an audio recording containing a detective's interviews with Bina, defendant's mother, and four eyewitnesses. However, defendant only asked the court to consider the interviews of the four eyewitnesses.

defendant's argument that the mandatory natural life sentence imposed by the trial court was unconstitutional as applied to him. Defendant is not foreclosed from raising his as-applied constitutional challenge in a postconviction petition. We note that "[t]he Post-Conviction Hearing Act specifically allows for raising ' "constitutional questions which, by their nature, depend[ ] upon facts not found in the record." ' " *Harris*, 2018 IL 121932, ¶ 48 (quoting *People v. Cherry*, 2016 IL 118728, ¶ 33, quoting *People v. Thomas*, 38 Ill. 2d 321, 324 (1967)). Our supreme court has noted that as-applied constitutional challenges could also potentially be raised in petitions seeking relief from final judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). *Harris*, 2018 IL 121932, ¶ 48. We express no opinion as to the merits of any future claim. We reject defendant's request that we remand the matter for an evidentiary hearing to determine whether he has an intellectual disability, as we believe defendant's claim is more appropriately raised in another proceeding. See *id.*

¶ 50 In reaching our holding, we reject defendant's reliance on *People v. Kochevar*, 2018 IL App (3d) 140660, ¶ 41, and *People v. Holman*, 2017 IL 120655, ¶¶ 29-32, for the proposition that he may raise his as-applied constitutional challenge for the first time on appeal. In both *Kochevar* and *Holman*, the courts found that the record was sufficiently developed to address the defendants' as-applied constitutional challenges. *Kochevar*, 2018 IL App (3d) 140660, ¶ 41; *Holman*, 2017 IL 120655, ¶ 32. As discussed above, the record is not sufficiently developed in this case. *Supra* ¶ 45. We note that the State agreed, based on the authority cited by defendant, that the issue had not been forfeited. However, the State also argued that the record does not conclusively establish that defendant has an intellectual disability. To the extent that the State's agreement that the issue was not forfeited constituted an agreement that the record was sufficiently developed to address the claim, we reject the State's concession.

16

¶ 51                                III. CONCLUSION

¶ 52        The judgment of the circuit court of Henry County is affirmed.

¶ 53        Affirmed.

¶ 54        JUSTICE McDADE, specially concurring:

¶ 55        I acknowledge the extremely heavy weight of the Illinois precedent cited in our opinion

holding that a witness is "available" for confrontation clause purposes when he or she is present

in the courtroom and willing, albeit unable, to answer questions. On the basis of that precedent—

and because the child's grandfather witnessed, testified to, and was available for meaningful

cross-examination about portions of the charged violation of the child—I concur in the judgment.

¶ 56        I write separately to agree with the argument of this defendant and numerous others

before him (and with the reasoning, which the majority unceremoniously rejects, of the Second

District in *People v. Learn*, 396 Ill. App. 3d 891 (2009)) that, as a purely practical matter, a

defendant cannot "confront" his accuser if that person, because he or she has little or no

recollection of the relevant events and can neither explain nor defend (nor corroborate, support,

or cast doubt on) the factual allegations that undergird and form the basis of the charged crime.

¶ 57        Illinois legislators recognized that details of a sexual assault may be difficult to elicit

initially and that the victim may be too traumatized or too young to preserve a full and accurate

recollection of the event. They enacted a statutory exception to the hearsay rule (725 ILCS

5/115-10 (West 2014)) to allow admission of contemporaneous statements by an alleged victim

and the testimony of permitted witnesses describing claimed sexual assault or abuse.

¶ 58        However, in my opinion and with respect, the legislature missed something critical. Some

"victims" have motivation to, and do, lie or otherwise misrepresent claimed facts. Further, an

accusation, untested through our adversarial judicial process, is just that; it is not a certainty nor

17

is it proof of wrongdoing. There needs to be something added during these initial stages of the inquiry into the allegations that also accommodates the need of the defendant or a representative to test and challenge the details and the accuracy of the accusation while the event(s) remain clear in the accuser's mind. Absent a realistic opportunity for meaningful cross-examination of the accuser at some point in the process, an accused is effectively deprived of his or her constitutionally protected right to a fair trial through denial of the opportunity to mount a thorough and meaningful defense and to have the relative credibility of the parties—not as to whether an accusation was made but whether the offense actually occurred—assessed by an informed finder of fact.

¶ 59     The traumatic and lifelong impact of sexual assault or abuse on victims is real and has been well documented. There are, similarly, myriad and lifelong consequences for persons who are convicted of such crimes. The possibility that a person will suffer those consequences on the basis of an erroneous conviction should chill us all. More importantly, it should move us to scrutinize possible flaws in the handling of child sex offenses in our adversarial system of justice and ensure that they are addressed and corrected.

¶ 60     The argument will be that such changes lie within the purview of the General Assembly and that is doubtlessly true. However, that body will have no reason or incentive to even visit the question as long as we—courts and judges—persist in putting our *imprimatur* on a utilitarian but inherently illogical, dangerous, and ultimately corrosive interpretation of the federal and state constitutional right to confront one's accuser.