# Illinois Official Reports

## Appellate Court

---

**People v. Graves, 2021 IL App (5th) 200104**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSHUA GRAVES, Defendant-Appellant. |
| District & No. | Fifth District<br>No. 5-20-0104 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | May 25, 2021<br><br>June 8, 2021<br>June 8, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Monroe County, No. 17-CF-125; the Hon. Dennis B. Doyle, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Donna Morrison Polinske, of Edwardsville, for appellant.<br><br>Christopher Hitzemann, State's Attorney, of Waterloo (Patrick Delfino and Patrick D. Daly, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE WELCH delivered the judgment of the court, with opinion.<br>Justices Barberis and Wharton concurred in the judgment and opinion. |

¶ 1    This is a direct appeal from the circuit court of Monroe County. The defendant, Joshua Graves, was convicted of one count of aggravated criminal sexual abuse. On February 26, 2020, he was sentenced to three years' imprisonment followed by two years of mandatory supervised release (MSR). The defendant raises five points on appeal: (1) that the trial court erred in admitting evidence, (2) that the court erred in denying his motion for directed verdict after the State initially rested its case, (3) that the court erred in granting the State's motion to reopen its proofs and admit further evidence, (4) that the court erred in failing to give a jury instruction, and (5) that defense counsel was ineffective for failing to tender the same instruction. For the reasons that follow, we affirm.

¶ 2                                I. BACKGROUND

¶ 3    On September 22, 2017, the defendant was charged by information with two counts of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2016)), relating to events that occurred on September 3, 2017. On March 29, 2019, the State filed an amended information. As to both counts, it was alleged that the defendant was over the age of 17; that the victim, K.F., was under the age of 13; and that the defendant committed an act of sexual conduct with the victim "for the purpose of the sexual arousal or sexual gratification of the defendant or the victim." The sexual conduct alleged in count I was that the defendant knowingly rubbed the victim's vagina over her underwear. The sexual conduct alleged in count II was that the defendant knowingly fondled the victim's breast over her shirt.

¶ 4    Prior to trial, the State filed a motion *in limine* regarding hearsay statements made by the victim pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2016)), along with a memorandum of law and argument in support of the motion. The State argued that, pursuant to the statute, out-of-court statements made by the victim should be admitted at trial. The trial court entered a written order granting the motion on June 20, 2019. In the order, the court determined that the hearsay statements would be admitted subject to the victim being made available for cross-examination.

¶ 5    On June 17, 2019, the defendant's three-day jury trial commenced. The State first presented testimony of the victim's mother, Kelly F.[1] Kelly testified that the defendant's son was the victim's best friend and the victim would stay at the defendant's house on weekends when the defendant's son was staying there. The defendant's father is the cousin of the victim's father.

¶ 6    The victim went to stay at the defendant's house over Labor Day weekend of 2017. Kelly dropped the victim off at the defendant's house on Saturday, and the plan was for the victim to stay there until Monday. However, the victim called on Sunday to say she was sick and wanted to go home, which Kelly found unusual because it was normally "like pulling teeth to get [the victim and the defendant's son] apart." The victim's aunt took the victim to her father's house, and the victim did not talk to her mother the rest of the day. Kelly worked the following Monday. When she returned home from work, the victim asked if she could talk to Kelly, who

---

[1]Because the victim's parents share a last name, we will refer to them individually by their first names for ease of reference.

asked if it could wait until later. At approximately 10 p.m. on Monday, Kelly sat down with the victim to talk.

¶ 7        At this point, the State asked Kelly what the victim said to her. The defendant's trial counsel objected to that line of questioning being pursued in front of the jury, and the objection was overruled. Kelly then testified that the victim told her that on Sunday morning, she woke up to the defendant touching her vagina above her clothes. The victim also said that the defendant touched her left breast and squeezed her hip. Kelly said the victim looked uneasy, worried, and "nervous about even saying anything." Because it was late in the evening, they did not call the police at that time. Kelly called the police the next day after she got off work.

¶ 8        The State next called Detective Brian Etherton of the Columbia Police Department, who testified that he and another detective were leading the investigation into the victim's allegations against the defendant. During the investigation, Etherton interviewed the victim's parents and the defendant; he also observed the victim's child advocacy center (CAC) interview. Etherton testified that he interviewed the defendant at the police department and conducted a home visit along with the Illinois Department of Children and Family Services (DCFS). During the interview at the police department, the defendant said that when his son and the victim spent the night at his house, they would all share a bed. The defendant would sleep on one side of the bed near the air conditioner, his son would sleep in the middle, and the victim would sleep on the other side of the bed. Etherton testified that the defendant knew the sleeping arrangement was a bad idea and that allegations could arise. The defendant said he was in the process of remedying the situation by getting bunk beds. He also had an air mattress that the kids sometimes slept on, but they did not like it as much because they could not see the television. However, after visiting the defendant's residence, Etherton believed that "you could have put an air mattress down next to the bed and been able to view the television." Etherton testified that the defendant maintained his innocence throughout the interview.

¶ 9        The jury next heard testimony from Emily Matecki, who conducted the victim's CAC interview. Prior to Matecki's testimony, the defendant's trial counsel objected to the introduction of the CAC video subject to the victim being available for cross-examination. The trial court noted the objection and allowed Matecki to testify as follows. On September 7, 2017, Matecki was employed by the St. Clair County Child Advocacy Center as a forensic interviewer. As part of her employment, she facilitated the forensic interview of a child who made allegations of abuse or neglect. Matecki testified that there are four stages to the interview protocol: (1) rapport building to orient the child to the interview, (2) transitioning to the topic of concern, (3) exploring the details, and (4) closure, which includes making sure the child feels comfortable. Prior to her interview, she would review police reports and/or DCFS reports relevant to the case.

¶ 10       Matecki interviewed the victim on September 7, 2017, when the victim was 11 years old. Matecki observed that the victim appeared "very comfortable" in the interview room, she "was able to give a clear episodic narrative of what *** happened," and she was also "able to correct the interviewer during the interview and demonstrate an adequate understanding of all the questions asked." The victim's interview was recorded, and the video recording was shown to the jury during Matecki's testimony. Defense counsel was asked if he had any objection; he relied on his "previously noted" objection.

¶ 11       During the CAC interview, Matecki initially told the victim that everything they talked about had to be truthful, she had the victim explain what that meant to her, and the victim

promised that everything she said would be truthful. Matecki also told the victim she could say if she did not know the answer to a question and that she could correct Matecki if she got something wrong. When Matecki asked the victim to tell her everything that happened, the victim said that she played with the defendant's son on Saturday, they went to bed, and the next morning, she "felt something touching" her. The victim looked over and saw the defendant touching her "below the waist." The victim said she could not say anything because she was startled, and she did not know that the defendant "liked [her] in that way." She rolled over and cried because she could not say anything. After the defendant realized the victim was crying, he asked if she was awake, to which she said "yeah." The defendant asked if the victim was okay, and she said "no." The defendant then said, "Well, I thought you would like it." The victim did not respond. The defendant said, "You're just cute. You're cute. I'm sorry." The defendant also said that he wanted the victim to keep what happened a secret; she did not respond. The victim said the incident lasted several minutes.

¶ 12     After the victim gave her narrative of what happened, Matecki asked for specifics. When asked where the defendant touched her, the victim motioned to her groin area and described it as "the place where you go to the bathroom." He was touching that area with his hand and on top of her shorts. When asked if the defendant touched her anywhere else on her body, the victim said he grabbed her breast over her clothes. The victim also said the defendant massaged her on the hip. The defendant's son was sleeping next to the victim while all of this was going on. The victim explained that they went to bed with the defendant on one side of the bed, his son sleeping in the middle, and the victim sleeping on the other side of the bed. However, when she woke up, the defendant had moved and was lying beside her.

¶ 13     The victim said that after the incident, she first told her mother that the defendant touched her below the waist for several minutes. She later told her mother that the defendant also grabbed her breast for a "quick second." The victim was scared to tell her mother, who was mad after the victim told her what happened. The victim's mother told the victim's father, so the victim's father also talked to her about it. The victim told Matecki that the defendant never touched her with anything other than his hand. The defendant had his clothes on during the incident, and he was lying flat on his back. The victim said that prior to the incident, she stayed with the defendant every two or three weeks when the defendant's son was there. She said that every time she stayed the night at the defendant's house, they would all sleep in the defendant's bed.

¶ 14     After the video was played, the State asked Matecki about an instance during the interview when the victim corrected her about the length of time that the defendant touched the victim's breast. Matecki testified that the correction was significant because "[w]hen a child demonstrates that they're able to correct the interview, it tells the interviewer that they are no more suggestible than any adult."

¶ 15     Detective Sergeant Karla Heine of the Columbia Police Department then testified that she interviewed the defendant along with Etherton. Heine was present when the defendant discussed the victim spending the weekends at his house and the sleeping arrangements. Heine described the victim's relationship with the defendant's son as "close," in that the victim enjoyed spending time with the defendant's son. Heine further testified that the defendant said his house was a "safe place" for the victim to go; officers were aware of the victim's home life and that her father was a registered sex offender.

¶ 16     The State next called the victim's father, Ronald F., to testify. The defendant's trial counsel objected to Ronald's hearsay testimony subject to the victim's testimony. Ronald testified that he had a felony conviction for possession of child pornography. When asked what the victim told him about Labor Day weekend of 2017, Ronald testified that the victim said she awakened to the defendant rubbing her on her vagina over her clothes and that he grabbed her breast over her clothes. Ronald and Kelly talked with the victim for about an hour to get an idea of what happened. They discussed how going to the police might affect the victim's friendship with the defendant's son and what she should expect. Ronald testified that the victim had changed since the incident. She used to engage in physical play, have tickle fights, or wrestle with him, but since then she shied away from those activities and was very uncomfortable.

¶ 17     The victim then testified that she was 12 years old, and she was going to be starting eighth grade at Columbia Middle School. She liked school, and her favorite subject was science. The State asked the victim if she recalled being interviewed by the CAC. The victim testified that she told the truth during the interview. The victim remembered Labor Day 2017. Her best friend at the time was the defendant's son, who would stay with the defendant every other weekend. She would go over to the defendant's house when his son was there, and they would play video games or ping pong. The State asked the victim about the layout of the defendant's house and had her identify photographs of the defendant's bedroom. The victim testified that she had not seen the defendant's son since Labor Day weekend of 2017, and that upset her. The victim agreed that she went home on the Sunday of that weekend, she told her parents what happened on Monday, and they discussed whether they should go to the police on Tuesday. During these discussions, the victim was concerned she would not get to see the defendant's son again.

¶ 18     On cross-examination, the victim said she was not forced to sleep in the defendant's bed and that the defendant's son was also in the bed. The victim testified that she interacted with the defendant at her aunt's house after the incident, but she did not act afraid. The victim also testified that she met with the prosecutor multiple times in preparing for her testimony. On redirect examination, the victim testified that the defendant's son was asleep when the incident happened.

¶ 19     After the victim's testimony, the State rested. At that point, defense counsel moved for a directed verdict, arguing that the State failed to meet its burden of proof. Defense counsel asserted that based on the jury instructions, there were three propositions that the State was required to meet. Two of the propositions related to the ages of the defendant and the victim, and the third was that the defendant committed an act of sexual conduct. Sexual conduct was defined as an "intentional or knowing touching or fondling by the accused, either directly or through the clothing of the sex organ or breast of the victim for the purpose of sexual gratification or arousal of the victim or the accused." Defense counsel argued that there was no testimony on the third proposition relating to the alleged sexual conduct.

¶ 20     The State responded that the motion for directed verdict should be denied because the victim testified to the intentional or knowing touching during her CAC interview. The trial court asked if the State was referring to the CAC interview as testimony, to which the State responded in the affirmative. The court then stated that the victim was not under oath and asked how the video could be considered testimony. The State responded, "The purpose of the statute is to allow victims that are under 13 to have their CAC—their interviews played—to be played in lieu of testimony as far as they're available." The State further argued that the victim testified

under oath at trial that "she was, in fact, truthful" during her CAC interview. At that point, the court took a recess so that the State could produce case law.

¶ 21     After the recess, the defendant's trial counsel said that he did not intend to call any additional witnesses and his client would not testify, "[s]o depending upon what Your Honor rules on the directed verdict, we would rest." The trial court inquired of the defendant whether that was his intent, and he agreed that it was. The court brought the jury back in, indicated that the State had rested, and asked defense counsel if he intended to present evidence. Defense counsel announced that the defense had rested. The court then told the jurors that the evidence portion of the trial was concluded, instructed them not to discuss the case, and dismissed them for the day.

¶ 22     The following morning, the trial court heard continued arguments about whether the victim had been available for cross-examination in compliance with its prior order about her out-of-court statements and whether the State's evidence was sufficient to withstand the motion for directed verdict. The State argued that there was testimony elicited from both Kelly and Ronald as to the victim's statements about the sexual acts committed by the defendant, as well as the CAC interview. The court responded that the testimony from the victim's parents and the CAC interview were all hearsay statements, which would only be admissible if the victim was available for cross-examination or if the victim was unavailable to testify at trial, but the statements were corroborated. The State agreed. The court then stated that "as far as I can see, there is no corroboration, other than hearsay statements," and "[y]ou have two hearsay statements corroborating one another." The State agreed that the hearsay statements corroborated each other.

¶ 23     The State further argued that, based on *Crawford v. Washington*, 541 U.S. 36 (2004), the victim was in court and available to answer questions. The trial court indicated that it did not believe that was sufficient because the victim did not make any allegations during her direct examination. The court's statements indicated that it may have been inclined to grant the defendant's motion for directed verdict.

¶ 24     The State then requested to reopen its evidence and that the victim be allowed to provide additional testimony. Defense counsel objected to the State being allowed to reopen its case since the State and the defense had both rested. Defense counsel then asserted that it was the State's fault that it did not meet its burden because it failed to ask the right questions when the victim was on the stand. The defendant's counsel further argued that the defendant would be prejudiced by the State reopening its case to get the victim to say what it failed to the first time around. After arguments, the trial court allowed the State to reopen its case-in-chief so that the victim could testify as to the allegations and be subject to cross-examination.

¶ 25     The State then called the victim to testify again. The victim testified that she went over to the defendant's house the Friday before Labor Day 2017 and planned to stay there until Monday afternoon. However, when the victim woke up that Sunday morning, the defendant was using his left hand to rub her vagina over her clothes for six to seven minutes. The victim then testified that she rolled over, and she assumed the defendant used his right hand to grab her waist, squeeze her breast, and went back to her waist. The night before, the defendant's son was in the middle of the defendant and the victim in the bed. However, when she woke up, the defendant's son was closest to the wall, she was in the middle, and the defendant was on the right side of the bed. The victim said she started crying. After the defendant realized she was awake, he stated, "Oh, you're awake," and then, "Are you okay?" The victim replied "no"

to which he stated, "I'm sorry. You're cute. You're cute. You're just cute. Do me a favor and keep this a secret, please."

¶ 26 On cross-examination, the victim admitted that she did say during the CAC interview that the defendant used his left hand to rub her vagina over her clothes or that he went from touching her waist to her breast back to her waist. The victim agreed that she was prepared by the State's counsel prior to giving her testimony that day, but that she was using her own words. She also testified that, being older at the time of trial than she was during the interview, she used more words to be more descriptive to the jury. She said that she went to her aunt's house after the incident, but she did not say anything to her aunt about what happened with the defendant. After the victim's testimony, the State rested again.

¶ 27 The defendant's trial counsel then renewed his motion for directed verdict. The trial court denied the motion, and the defense rested. The defense moved for a directed verdict at the close of all the evidence, which the court denied.

¶ 28 After closing arguments, the trial court instructed the jury, *inter alia*, that:

"You have before you evidence that [the victim] made statements concerning the offenses charged in this case. It is for you to determine whether the statements were made, and, if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of [the victim], the nature of the statements, and the circumstances under which the statements were made."

The jury found the defendant guilty on count I and not guilty on count II.

¶ 29 On July 18, 2019, the defendant filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial alleging, in part, that the trial court erred in admitting hearsay evidence pursuant to section 115-10 of the Code (725 ILCS 5/115-10 (West 2016)), in denying the defendant's motion for directed verdict after the State rested its case for the first time, and in granting the State's motion to reopen. On February 26, 2020, a hearing was held on the posttrial motion and sentencing. The court denied the defendant's posttrial motion and sentenced him to three years' imprisonment followed by two years of MSR.

¶ 30 The defendant filed his notice of appeal on March 20, 2020.

¶ 31                              II. ANALYSIS

¶ 32 On appeal, the defendant makes five contentions of error. First, he argues that the trial court erred in admitting the victim's out-of-court statements pursuant to section 115-10. Second, he asserts that the court erred in denying his motion for directed verdict after the State initially rested its case. Third, he contends that the court erred in granting the State's motion to reopen. Fourth, he maintains that the court erred in failing to give a jury instruction pursuant to section 115-10(c). Fifth, he argues that defense counsel was ineffective for failing to tender the same instruction.

¶ 33                  A. The Victim's Out-of-Court Statements

¶ 34 The first issue raised by the defendant is whether the trial court erred in admitting the victim's out-of-court statements, *i.e.*, the statements she made during the CAC interview and the statements that she made to her parents, pursuant to section 115-10 of the Code (*id.*). The defendant argues that the admission of the victim's out-of-court statements violated both section 115-10 as well his right to confront witnesses as guaranteed by the United States and

Illinois Constitutions. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *People v. Dabney*, 2017 IL App (3d) 140915, ¶ 17. Further, we review questions of law, such as whether a defendant's constitutional rights under the confrontation clause were violated by the admissibility of evidence, *de novo*. *Id.*

¶ 35 Section 115-10 of the Code provides that, in a prosecution for a sexual act perpetrated against a child under the age of 13, certain out-of-court statements made by the child victim may be admitted at trial as an exception to the hearsay rule where (1) the trial court conducts a hearing outside the presence of the jury to determine the reliability of the statements and (2) the victim testifies at trial or is unavailable but evidence corroborating the statement is presented. *People v. Riggs*, 2019 IL App (2d) 160991, ¶ 26; see also 725 ILCS 5/115-10(a), (b)(2)(B) (West 2016). At issue here is whether the victim testified at trial so as to satisfy this requirement of the statute.

¶ 36 However, for an out-of-court statement of a minor victim to be admissible at trial, the statement must comply with the requirements of section 115-10 as well as the confrontation clause of the United States and Illinois Constitutions. *People v. Kitch*, 239 Ill. 2d 452, 469-70 (2011). "The confrontation clause guarantees a criminal defendant the right to confront the witnesses against him or her." *Dabney*, 2017 IL App (3d) 140915, ¶ 18; U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. The United States Supreme Court has declared that the confrontation clause places no restrictions on the admission of an out-of-court statement when the declarant testifies at trial and is present to defend or explain the statement. *Crawford*, 541 U.S. at 59 n.9; *Kitch*, 239 Ill. 2d at 467. Stated differently, the declarant must appear at trial for cross-examination. See *Crawford*, 541 U.S. at 59 n.9; *Kitch*, 239 Ill. 2d at 467.

¶ 37 In support of his argument, the defendant relies primarily on *People v. Learn*, 396 Ill. App. 3d 891 (2009). In that case, witnesses were allowed to testify about hearsay statements made by the minor victim indicating she had been sexually abused by defendant. *Id.* at 893-97. At trial, it took extensive questioning on direct examination before the victim acknowledged defendant's existence, and the only information she gave about defendant was that he was her aunt's husband. *Id.* at 896-98. The victim did not testify that defendant touched her, and she did not testify about her out-of-court statements. *Id.* When questioned further by the prosecution, the victim began to cry, and after a recess, the prosecution did not resume questioning her. *Id.* Defense counsel asked the victim only five questions and did not elicit any damaging testimony against defendant. *Id.* at 897-98.

¶ 38 The Second District found that the minor victim was unavailable as a witness and that she did not "testify" for purposes of section 115-10(b)(2)(A). *Id.* at 898-902. In so concluding, the appellate court held that "[i]f the child is the only witness (other than hearsay reporters) who can accuse the defendant of actions constituting the charged offense, the child must testify and accuse if she is to be considered to have testified at the proceeding under section 115-10(b)(2)(A)." (Emphasis omitted.) *Id.* at 900. The court also held that the declarant's mere presence or general background testimony "are insufficient to qualify as the appearance and testimony of a witness." *Id.* at 900-02. Reviewing the testimony given at trial, the court noted that the minor victim did not testify at all about the charge against defendant and that she "barely acknowledged the people and places about which she was questioned." *Id.* at 900. Thus, according to the reviewing court, the victim did not "bear testimony" against defendant because she did not make accusations or give relevant and material testimony. *Id.* The court

also noted that there was nothing for defense counsel to cross-examine because the victim "did not confront the defendant and accuse him of anything." *Id.* at 901.

¶ 39 The defendant's reliance on *Learn* is precarious for multiple reasons. First, we find it important to highlight the extensive negative treatment Illinois courts have ascribed to *Learn* since that decision was issued. It has been noted on several occasions that the Second District has subsequently distanced itself from *Learn. People v. Vannote*, 2012 IL App (4th) 100798, ¶ 31 (citing *People v. Sundling*, 2012 IL App (2d) 070455-B, *People v. Garcia-Cordova*, 2011 IL App (2d) 070550-B, and *People v. Martin*, 408 Ill. App. 3d 891 (2011)). Moreover, our research reveals that no court has cited *Learn* approvingly. *People v. Smith*, 2019 IL App (3d) 160631, ¶ 36; *In re Brandon P.*, 2013 IL App (4th) 111022, ¶ 44; see also *Sundling*, 2012 IL App (2d) 070455-B, ¶ 66; *Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 62. Even courts that have stopped short of expressly disagreeing with *Learn* have found ways to distinguish it from the facts before them. See, *e.g.*, *Kitch*, 239 Ill. 2d at 464-65; *People v. Kennebrew*, 2014 IL App (2d) 121169, ¶ 38; *People v. Major-Flisk*, 398 Ill. App. 3d 491, 507-08 (2010).

¶ 40 We similarly find that the circumstances presented in this case are distinguishable from those involved in *Learn*. Here, the victim testified on direct examination about the defendant and her relationship to him, and she described in detail the layout of his house and the bedroom where the crimes took place. Moreover, the victim was specifically asked about the statement she gave during the CAC interview, and she confirmed that what she said during that statement was truthful. The victim also testified that she went home that Sunday of Labor Day weekend 2017, she told her parents what happened on Monday, and they discussed whether they should go to the police on Tuesday. The victim answered all of the questions asked of her by the State as well as defense counsel. We find that this rose above the level of mere presence and background testimony that the *Learn* court found insufficient to amount to testimony. The victim never became unwilling, unable, or incompetent to testify during her testimony. She did not shut down when asked about her out-of-court statements or the circumstances surrounding the offenses; she simply just was not asked to provide more details about the defendant's conduct. Under these circumstances, we find that the victim testified at the defendant's trial as required by section 115-10(b)(2)(A) of the Code (725 ILCS 5/115-10(b)(2)(A) (West 2016)). Therefore, the trial court did not abuse its discretion in admitting her out-of-court statements under the statute.

¶ 41 To the extent that our decision here can be read as being inconsistent with the appellate court's ruling in *Learn*, we respectfully disagree with the conclusion reached by the court in that case and do not believe that it reflects the current state of Illinois law on this issue. See *Dabney*, 2017 IL App (3d) 140915, ¶ 21 (similarly holding); see also *Kennebrew*, 2014 IL App (2d) 121169, ¶ 47 (Schostok, J., specially concurring) (collecting cases to support the position that the *Learn* court misinterpreted *Crawford*). In holding that the statute required a victim to "testify and accuse," the *Learn* court implicitly found that the testimony requirement of section 115-10(b)(2)(A) required more than availability for cross-examination to satisfy the confrontation clause. *Kennebrew*, 2014 IL App (2d) 121169, ¶ 38 (majority opinion). It is the only court to do so. Instead, other courts have found, pursuant to *Crawford*, 541 U.S. at 59 n.9, that when a declarant is available for cross-examination, the confrontation clause places no other restrictions on the use of his or her out-of-court statements. *Kennebrew*, 2014 IL App (2d) 121169, ¶¶ 49-57 (Schostok, J., specially concurring); *Brandon P.*, 2013 IL App (4th) 111022, ¶¶ 45-46. We choose to align ourselves with the majority of Illinois courts.

¶ 42    Additionally undermining the defendant's reliance on *Learn* is the fact that the *Learn* court explicitly stated that it was deciding the case on statutory rather than constitutional grounds. *Learn*, 396 Ill. App. 3d at 899-900, 905. Although the court relied on—and perhaps conflated—the constitutional and statutory principles relating to a child victim's hearsay statements, it cautioned that its analysis was "not a confrontation clause analysis." *Id.* at 899; see also *Kennebrew*, 2014 IL App (2d) 121169, ¶ 36 (noting that the holding in *Learn* was based on a section 115-10 analysis rather than a confrontation clause analysis). Therefore, we now turn to case law analyzing whether out-of-court statements admitted under section 115-10 violated the confrontation clause in order to address that question in this case.

¶ 43    As previously stated, the confrontation clause places no restrictions on the admission of an out-of-court statement when the declarant testifies at trial and is present to defend or explain the statement. *Crawford*, 541 U.S. at 59 n.9; *Kitch*, 239 Ill. 2d at 467. Stated differently, the declarant must appear at trial for cross-examination. See *Crawford*, 541 U.S. at 59 n.9. " 'Where the declarant appears for cross-examination, even where the declarant does not testify to the substance of [her] hearsay statement, its admission is a nonevent under the confrontation clause.' " *Smith*, 2019 IL App (3d) 160631, ¶ 31 (quoting *Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 66). In fact, many Illinois cases have held that child victims of sex offenses were available for cross-examination for confrontation clause purposes where they testified at trial and answered the questions asked of them on cross-examination even if they did not testify to all or some of the charged conduct. *Id.*; *Dabney*, 2017 IL App (3d) 140915, ¶ 20 (collecting cases). "[T]he key inquiry when determining whether a declarant is available for cross-examination is whether the declarant was present for cross-examination and answered questions asked of her by defense counsel." (Internal quotation marks omitted.) *Brandon P.*, 2013 IL App (4th) 111022, ¶ 46.

¶ 44    In this case, it is undisputed that the victim was present for cross-examination and answered all the questions asked of her by the State as well as defense counsel. Therefore, we conclude that she was available for cross-examination, as required by the confrontation clause, and the admission of her out-of-court statements was a " 'nonevent under the confrontation clause.' " *Smith*, 2019 IL App (3d) 160631, ¶ 31 (quoting *Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 66).

¶ 45    Although the victim did not testify to the charged conduct, we note that there was nothing stopping defense counsel from cross-examining her about the allegations made in her out-of-court statements. Counsel had notice of the out-of-court statements that were going to be admitted in advance of trial. Counsel was also present when such evidence was elicited and during the State's direct examination of the victim. The defendant argues that he should not have been expected to elicit details of the offenses so that he could cross-examine the victim about them. However, "[w]here a defendant does not attempt to cross-examine a witness on her out-of-court statements, he cannot complain that the witness was unavailable for cross-examination." *Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 63 (citing *People v. Lewis*, 223 Ill. 2d 393, 405 (2006)). Further, "a defendant's right to confront witnesses cannot be recast as the State's burden to confront witnesses." *Riggs*, 2019 IL App (2d) 160991, ¶ 38 (citing *Garcia-Cordova*, 2011 IL App (2d) 070550-B, ¶ 61). The confrontation clause guarantees only the opportunity for cross-examination, which the defendant was given in this case.

¶ 46    Finally, we address the defendant's assertion that *Dabney* and other "memory-loss cases" cited herein do not apply to the facts of this case, where the victim did not suffer memory loss.

- 10 -

Our research has revealed that memory-loss cases have been cited in cases dealing with a victim not testifying to charged conduct simply because he or she was not asked. See, *e.g.*, *id.* ¶ 36. As did the Second District in *Riggs*, we find that the same rationale applies, regardless of whether the victim answered that she did not recall events or whether she simply was not asked. See *id.* In either situation, we must still consider whether the victim was present and willingly answered all questions put to her by both parties. In this case, we find that she did. Therefore, we conclude that the admission of the victim's out-of-court statements did not violate the defendant's constitutional rights to confront the witnesses against him.

¶ 47                                B. Motion for Directed Verdict

¶ 48        The defendant also contends that the trial court erred in denying his motion for directed verdict after the State initially rested its case. In reviewing a defendant's challenge to the trial court's denial of his motion for a directed verdict, we must determine whether the evidence presented, viewed in the light most favorable to the State, established defendant's guilt beyond a reasonable doubt. *People v. Schronski*, 2014 IL App (3d) 120574, ¶ 19.

¶ 49        The defendant in this case was charged with aggravated criminal sexual abuse. To sustain the conviction as to count I, the State was required to prove that (1) the defendant committed an act of sexual conduct with the victim, (2) the defendant was 17 years of age or older, and (3) the victim was under the age of 13 when the act was committed. See 720 ILCS 5/11-1.60(c)(1)(i) (West 2016). The act of sexual conduct charged in count I was that the defendant touched the victim on her vagina over her underwear.

¶ 50        It is undisputed that the defendant was over the age of 17 and the victim was under the age of 13 when the sexual act was committed. Therefore, the only element at issue is whether the defendant committed the act of sexual conduct of touching the victim on her vagina over her underwear. Having found that the CAC interview and the victim's out-of-court statements to her parents were properly admitted during the State's initial case-in-chief, we find that the State presented sufficient evidence to support a finding that the defendant committed aggravated criminal sexual abuse. The State's evidence demonstrated that the victim came home early from the defendant's house, which Kelly, her mother, found unusual. The next day, the victim wanted to talk to Kelly; when the two eventually were able to talk, the victim told Kelly that she woke up to the defendant touching her vagina over her underwear. Kelly observed that the victim looked uneasy, worried, and "nervous about even saying anything." Similarly, the victim's father, Ronald, testified that the victim said she woke up to the defendant rubbing her on her vagina over her clothes. Ronald noted that the victim had changed since the incident; while she used to engage in physical play, have tickle fights, or wrestle with him, those activities now made her uncomfortable.

¶ 51        During the CAC interview, the victim revealed that on Sunday morning, she woke up and "felt something touching" her. The victim looked over and saw the defendant touching her "below the waist." The victim could not say anything because she was startled, and she did not know that the defendant "liked [her] in that way." She rolled over and cried because she could not say anything. After the defendant realized the victim was crying, he asked if she was awake, to which she said "yeah." The defendant asked if the victim was okay, and she said "no." The defendant then said, "well, I thought you would like it." The victim did not respond. The defendant said, "You're just cute. You're cute. I'm sorry." The defendant also said that he

wanted the victim to keep what happened a secret; she did not respond. The victim said the incident lasted several minutes.

¶ 52    When the victim was asked to be more specific about where the defendant touched her "below the waist," the victim motioned to her groin area and described it as "the place where you go to the bathroom." She said the defendant touched that area with his hand and on top of her shorts. The victim subsequently reported to her mother that the defendant touched her below the waist for several minutes. The victim's mother told the victim's father, so the victim's father also talked to her about it. The victim told Matecki that the defendant had his clothes on during the incident, and he was lying flat on his back. The victim said that prior to the incident, she stayed with the defendant every two or three weeks when the defendant's son was there. She said that every time she stayed the night at the defendant's house, they would all sleep in the defendant's bed.

¶ 53    During the interview, Matecki initially told the victim that everything they talked about during the interview had to be truthful, she had the victim explain what that meant to her, and the victim promised that everything she said would be truthful. Matecki also told the victim she could say if she did not know the answer to a question and that she could correct Matecki if she got something wrong. At trial, Matecki observed that the victim appeared "very comfortable" in the interview room, she "was able to give a clear episodic narrative of what *** happened," and she was also "able to correct the interviewer during the interview and demonstrate an adequate understanding of all the questions asked." When the State asked Matecki about an instance during the interview when the victim corrected her about a detail in the narrative, Matecki testified that the correction was significant because "[w]hen a child demonstrates that they're able to correct the interview, it tells the interviewer that they are no more suggestible than any adult." Moreover, the victim testified during her direct examination that she recalled giving the CAC interview, and everything she said during that interview was true.

¶ 54    We find that the foregoing evidence, viewed in the light most favorable to the State, established the defendant's guilt beyond a reasonable doubt. The victim's statements to her parents and during the CAC interview were sufficient to establish that the defendant committed an act of sexual conduct in that he touched the victim on her vagina over her underwear, which is the only element of the offense that is disputed on appeal. Accordingly, the trial court did not err in denying the defendant's motion for directed verdict after the State rested its case for the first time.

¶ 55                                    C. Motion to Reopen

¶ 56    The defendant additionally maintains that the trial court erred in granting the State's motion to reopen. However, as we have already concluded that the victim's out-of-court statements were properly admitted during the State's initial case-in-chief, and that the evidence was sufficient to establish the defendant's guilt when the State initially rested its case, we need not address this point because it was not necessary for the State to reopen its proofs and admit evidence in the first place.

¶ 57                                    D. Jury Instruction

¶ 58    The defendant's remaining contentions both relate to the jury instruction required under section 115-10(c) of the Code (725 ILCS 5/115-10(c) (West 2016)). He initially maintains that

the trial court erred in failing to tender the instruction. He additionally argues that his trial counsel was ineffective for failing to request the instruction.

¶ 59 Section 115-10(c) provides in part:

"If a statement is admitted pursuant to this Section, the court shall instruct the jury that it is for the jury to determine the weight and credibility to be given the statement and that, in making the determination, it shall consider the age and maturity of the child, *** the nature of the statement, the circumstances under which the statement was made, and any other relevant factor." *Id.*

Illinois Pattern Jury Instructions, Criminal, No. 11.66 (4th ed. 2000), which was intended to implement the statutory requirement, states:

"You have before you evidence that _____ made statements concerning the offenses charged in this case. It is for you to determine whether the statements were made, and, if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of _____, the nature of the statements, and the circumstances under which the statements were made."

¶ 60 In this case, the jury was instructed that:

"You have before you evidence that [the victim] made statements concerning the offenses charged in this case. It is for you to determine whether the statements were made, and, if so, what weight should be given to the statements. In making that determination, you should consider the age and maturity of [the victim], the nature of the statements, and the circumstances under which the statements were made."

The foregoing instruction satisfied the requirements of the statute and complied with the Illinois pattern jury instruction. Under these circumstances, the defendant's claims that the trial court failed to give the appropriate instruction and that defense counsel was ineffective for failing to request it are clearly without merit.

¶ 61 III. CONCLUSION

¶ 62 For the foregoing reasons, the judgment of the circuit court of Monroe County is hereby affirmed.

¶ 63 Affirmed.