2024 IL App (1st) 211175-U

No. 1-21-1175

Filed July 18, 2024

Fourth Division

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 9154 |
| | ) | |
| SIDNEY BUTLER, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Rochford and Justice Ocasio concurred in the judgment.

**ORDER**

¶ 1   *Held*:  (1) Child victim's out-of-court statements in recorded interview were admissible when child victim testified at trial and was available for cross examination. (2) Failure to request redactions did not amount to ineffective assistance of counsel when defendant expressly consented to have the jury view the full interview. (3) Trial court was not required to give instruction on defendant's pretrial statements *sua sponte*. (4) Prosecutor's remarks in closing arguments did not deprive defendant of a fair trial.

¶ 2   Sidney Butler was charged by indictment with two counts of predatory criminal sexual assault, two counts of aggravated criminal sexual assault, and three counts of aggravated criminal sexual abuse. Each charge alleged that the crimes were perpetrated against Butler's younger sister,

K.P., when she was under the age of 13. A jury found Butler guilty on all seven counts and he was sentenced to an aggregate term of 21 years' imprisonment. Butler appeals, claiming that (1) K.P.'s out-of-court interview was improperly admitted into evidence when her trial testimony was not accusatory, (2) trial counsel was ineffective for failing to request that certain portions of the video interview not be published to the jury, (3) the trial court should have instructed the jury on how to consider evidence of Butler's pretrial statements, and (4) the prosecutor made improper remarks in closing argument, depriving him of a fair trial. For the reasons that follow, we affirm.[1]

¶ 3                                    I. BACKGROUND

¶ 4                                    A. *Pre-trial Matters*

¶ 5        Before trial, the State requested a hearing, pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10(b)(1) (West 2016)), on the admissibility of a video recorded victim sensitive interview (VSI). At the hearing, forensic interviewer Ali Alstott testified that she interviewed K.P. one-on-one at the Chicago Children's Advocacy Center (CAC) on November 10, 2014. After reciting her credentials, Alstott explained that she followed a protocol for the interview that uses open-ended, non-suggestive questioning. Alstott did not review any police reports or other information regarding K.P.'s case before the interview.

¶ 6        A recording of the interview was played at the hearing. K.P. stated that she was age nine and she lived with her mother, sister, and brother. Her father, Roland, stays at their house. K.P. said her dad is "mean" and "always hits me." K.P. went on to discuss the latest occasion when her dad hit her. She explained that he was angry because her little sister told him K.P. had "touched on [her] little sisters." When confronted by him, K.P. told her dad that her brothers and cousin had been "touching on" her. Alstott asked K.P. who had been "touching on" her. K.P. identified her

_____

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

cousin, Matthew, brothers, Kevon and Sidney, and her mom's "old boyfriend," Tyree. K.P. explained that she had not told anyone before because her brothers told her to "be quiet about it."

¶ 7    K.P. stated that Sidney began "doing stuff" to her when she was four years old on occasions when her parents were not home. When asked to specify, K.P. said he "pulled his private part out of his clothes," made her "suck his private part," pulled her "panties down," and put his "private part" in her "butt." K.P. stated that she and Sidney were both standing when she sucked on his private part. K.P. then said she was "like this" when Sidney put his private part in her butt, demonstrating by bending her torso forward. She also demonstrated Sidney's action by thrusting her pelvis. She explained that Sidney put his "private part" in the "line" but not the "hole," and it hurt. Sidney made K.P. "pinky promise" not to tell anyone. K.P. said Sidney did these things to her "more than five times" and as recently as 2013, before he moved out of her home. She went on to describe an incident when she was age five. Sidney tried to make her "suck his private part and [she] didn't want to." Sidney placed his right hand behind her head and pushed her head back and forth. K.P.'s sister pulled her away. K.P. ran to a bathroom and feigned sickness to deter Sidney from entering. K.P. described in detail other instances when her cousin and other brother did similar things to her.

¶ 8    Later, K.P. relayed that her father is violent toward others in her home. Specifically, he has hit and thrown items at her mom, "slammed" her brother into a wall, and hit her little sisters, turning their skin red. On the most recent occasion, K.P.'s mom tried to intervene when Roland was beating K.P., but he pushed her mom and threw her mom into a wall.

¶ 9    At the conclusion of the interview, Alstott asked K.P. if she knew the difference between the truth and a lie. K.P. replied that the truth is when "you tell what really happened" and a lie is when "you don't tell what really happened, you tell a different story." K.P. confirmed that

everything she had talked about was the truth and no one had told her what to say or not say. K.P. also confirmed that no one had spoken with her about being interviewed at the CAC beforehand. She was only told that she was "going to walk to another building."

¶ 10    Butler submitted a handwritten statement from K.P.'s father, Roland, which he had given to police on December 30, 2014. In the statement, Roland explains that K.P. is his daughter with K.P.'s mother, T.P., and he has three other children with a different mother, including a daughter, R.P. Roland had been living with T.P. and her four children, which included K.P., another daughter, and T.P.'s two sons, Kevon and Sidney. On November 5, 2014, Roland received a call from R.P.'s mother, informing him that R.P. said, "smell my breath it smells like [K.P.]'s tutu." Roland went to T.P.'s home and confronted K.P. about "what she had been doing to his little kids." T.P. screamed and smacked K.P. when she stood silent. K.P. then admitted she had been "making her sisters eat her stuff" and said she "deserved to die." Roland told T.P. he was going to give K.P. a "whooping" and began whipping her with his belt. T.P. began whipping K.P. with an orange extension cord. Throughout the "whooping," K.P. turned, twisted, and screamed, "I deserve to die." The next day, K.P. was "welted up pretty good." She was kept home from school as her parents wanted to conceal her welts.

¶ 11    The State argued that the VSI exhibited sufficient safeguards of reliability to be admissible under section 115-10. The State noted that K.P. gave detailed descriptions of her abusers' genitals and of sexual conduct beyond the knowledge of a normal nine-year-old. In addition, she gave specific and unique details of different incidents involving different abusers. Butler's counsel argued that K.P.'s statements were coerced by the "vicious beating" she endured a few days before the VSI, and it was not sufficiently reliable to justify its admission.

¶ 12    The court found that the VSI provided sufficient safeguards of reliability and would be admissible at trial if K.P. testifies. The court observed that K.P. had not been forced to "give up" or accuse Butler. Rather, K.P.'s outcry was "a tangent out of the original family incident."

¶ 13    The State later informed the court that it intended to introduce the entirety of K.P.'s VSI at trial, which included discussion of collateral matters, such as K.P.'s admission to sexual conduct with her younger siblings. Defense counsel indicated that Butler wanted the VSI played in full. Butler confirmed his agreement when asked directly by the court.

¶ 14    Additionally, the State indicated that it planned to introduce evidence of Butler's statements to detectives admitting that he was K.P.'s brother and had babysat her. Defense counsel objected based on the rule of completeness. He argued that the statements should not be admitted unless Butler's other statements in the same interview denying he assaulted or abused K.P. were also admitted. The court overruled the objection, reasoning that the rule of completeness pertains to distinct topics, not an entire interview.

¶ 15                                    B. *Trial*

¶ 16    K.P. was the first witness called. She testified that she was 13 years old and in the seventh grade.[2] The prosecutor began asking K.P. about her family. K.P. nodded her head in response to a few questions and then became unresponsive. The prosecutor asked K.P. whether she understood the questions or was refusing to answer. K.P. gave no response. The jury was excused from the courtroom. The parties agreed that K.P. was refusing to answer questions. The prosecutor explained, "I didn't really know what to anticipate in this case. I haven't had the opportunity to speak with her. Her mother would not let me speak with her." The parties agreed to recall K.P. after another witness testified.

_____

[2]The trial took place in March 2019.

¶ 17     Chicago Police Detective Ian Barclay testified that he met K.P.'s grandmother on November 10, 2014, when she brought K.P. to the CAC. Detective Barclay learned that K.P. was born in 2005 and was nine years old at that time. Ali Alstott, a forensic interviewer, met with K.P. in a "pod," which consists of an interview room equipped with recording devices and an observation room. Persons in the observation room can see the interview room through one-way glass, but not vice-versa. Detective Barclay identified a DVD as a recording of K.P.'s interview. Detective Barclay interviewed Butler in May 2015. In the interview, Butler admitted that K.P. was his sister and that he used to babysit her.

¶ 18     The State recalled K.P. She testified that she lived with her mom and has a sister and two brothers, including Butler. When she was age nine, they lived at 932 Latrobe Avenue in Chicago. K.P. was initially unresponsive when asked whether Butler babysat her before answering, "I don't know." The prosecutor began asking K.P. questions regarding whether Butler had done anything to her. K.P. either nodded her head or gave no response.

¶ 19     The court again excused the jury. The State informed the court that K.P.'s mother was standing and waving while K.P. was on the stand and requested that she be barred from the courtroom. The court stated that it had not observed K.P.'s mother due to a screen obstructing its view of the gallery. The court summoned K.P.'s mother to come forward and admonished her not to make signals to witnesses. The court admonished K.P. that she had to give verbal responses.

¶ 20     K.P.'s testimony resumed before the jury. She lived at 932 Latrobe with her mother, siblings, and Roland Pierce in 2014. K.P. identified Butler in court as her brother. When asked whether Butler did anything to her, K.P. answered, "No, I don't remember." She identified herself at age nine in a screenshot from the VSI and agreed she was interviewed by a woman in November 2014. K.P. answered that she did not remember what she talked about, but she was interviewed

due to "household issues" she was having with Roland. Roland hurt her and she went to a hospital before the interview. In the interview, K.P. talked about "what happened with Roland Pierce." She agreed that she also mentioned Butler as a person who had "done something" to her. K.P. stated that she did not remember Butler doing anything to her when they lived on Latrobe and only remembers "bringing up his name" in the interview. The prosecutor read several questions and answers from a transcript of the VSI in which K.P. described sex acts Butler performed with her. K.P. answered that she did not remember being asked the questions or giving the answers.

¶ 21    On cross examination, K.P. testified that her mother picked her up from school one day in November 2014. Once home, Roland accused K.P. of "doing something with [her] little cousins." He whipped her with his belt and an orange extension cord many times. He also struck her with Timberland boots, a video game, and spit on her. Roland made K.P. spend the night in the basement, where she slept on the floor without a blanket. K.P. had welts and other injuries to her arms and legs. The next day, Roland gave K.P. a long sleeve shirt to wear to cover the marks on her arms. K.P. spent a second night in the basement. The next day, K.P.'s cousin, Asia, took her to Rush Hospital in Oak Park. While there, her injuries were photographed. K.P. identified 13 photos taken at that time depicting her injuries. The CAC interview was two days later. K.P. was still in pain from the beating at the time of the interview.

¶ 22    The State moved to publish K.P.'s VSI interview by playing it for the jury. The defense objected, arguing that the State had not established a sufficient foundation and that K.P. had not "testified adequately to allow the video to be played." The court overruled the objection and allowed the State to publish the video.

¶ 23    Alison Alstott testified that she is a licensed clinical social worker employed at the CAC. On November 10, 2014, she was assigned to interview K.P., who was nine years old at the time.

On cross examination, Alstott testified she was aware before the interview that K.P. was injured and she noticed wounds during the interview.

¶ 24        The State submitted copies of K.P.'s and Butler's birth certificates, which indicated Butler was born in 1995 and K.P. in 2005.

¶ 25        Butler called his mother, T.P. She testified that on a weekday afternoon in November 2014, she, Kevon, K.P., her other daughter, and Roland met in the kitchen of their home. Roland "went crazy," striking "everyone" with his belt and extension cords. K.P. received "lash-type injuries" to her arms, legs, and torso. Police officers and personnel from the Department of Children and Family Services (DCFS) arrived. T.P.'s cousin, Asia, came and picked up her daughters. Asia took K.P. to the hospital later that night.

¶ 26        On cross examination, T.P. explained that Roland had called her before the family meeting and stated that "there was something sexual going on." This revelation is what caused Roland to go "crazy" and become violent. T.P. denied that K.P. ever made an outcry to her about being abused. T.P. further denied that K.P. was made to sleep in the basement and maintained that Asia took K.P. from the home the same day as the beating.

¶ 27        On redirect, T.P. confirmed that Roland asked K.P. to admit to "doing something sexually wrong" and wanted to know how she knew "how to do those things."

¶ 28        In closing arguments, defense counsel contended that K.P.'s VSI was "the product of torture" inflicted by Roland. After being confronted about abusing Roland's other daughter, suffering beatings, and forced to sleep in the cold basement for days, counsel submitted, K.P. was "in her mind *** told to confess on some people." That is, Roland "believed that *** someone had shown [K.P.] how" to abuse his other daughter and he wanted to know who. As a result of the "torture," K.P. "came up with names," including Butler's.

¶ 29    The jury found Butler guilty on all seven counts. Upon Butler's posttrial motion, filed by new counsel, the court vacated one count of predatory criminal sexual assault and one count of aggravated criminal sexual assault, finding that the evidence was insufficient to prove contact between Butler's penis and K.P.'s anus. The court rejected Butler's other claims that the VSI was improperly admitted, trial counsel was ineffective for not requesting a limiting instruction on Butler's pretrial statements, and certain remarks from the prosecutors in opening and closing statements deprived him of a fair trial.

¶ 30    The court merged three counts of aggravated criminal sexual abuse and sentenced Butler to consecutive terms of nine years for predatory criminal sexual abuse, nine years for aggravated criminal sexual assault, and three years for aggravated criminal sexual abuse for a total prison term of 21 years. Butler filed a timely notice of appeal.

¶ 31                                II. ANALYSIS

¶ 32                     A. *Admissibility of Out-of-Court Statements*

¶ 33    Butler first argues that K.P.'s VSI was erroneously admitted into evidence. He claims both that the interview did not meet the conditions for admission under section 115-10 and that its admission violated his constitutional right to confront witnesses. He contends that K.P. did not "testify" for purposes of both section 115-10 and the sixth amendment's confrontation clause because she gave no testimony accusing Butler of anything. Instead, she said she did not remember him doing anything to her, only recalled bringing his name up during her interview, and denied remembering any of the questions and answers of the interview.

¶ 34    We review the trial court's ruling on the admissibility of a statement under section 115-10 for an abuse of discretion, but whether a defendant was deprived of their constitutional right to

confront witnesses is a question of law that we review *de novo*. *People v. Dabney*, 2017 IL App (3d) 140915, ¶ 17.

¶ 35    For a minor victim's out-of-court statement to be admissible at trial, the statement must comply with both the requirements of section 115-10 and the confrontation clause. *People v. Kitch*, 239 Ill. 2d 452, 469-70 (2011). "The confrontation clause guarantees a criminal defendant the right to confront the witnesses against him or her." *Dabney*, 2017 IL App (3d) 140915, ¶ 18; U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. Section 115-10 provides that in a prosecution for a sexual act perpetrated against a child under the age of 13, certain out-of-court statements made by the child victim may be admitted as substantive evidence at trial as an exception to the hearsay rule. Such statements are admissible so long as (1) the trial court conducts a hearing outside the presence of the jury to determine the reliability of the statements, and (2) the victim testifies at trial or is unavailable but evidence corroborating the statement is presented. *People v. Riggs*, 2019 IL App (2d) 160991, ¶ 26; 725 ILCS 5/115-10(a), (b)(2) (West 2018).

¶ 36    Butler argues that K.P.'s trial testimony failed to satisfy the statute's condition for admissibility. Specifically, he contends that K.P.'s testimony lacked any accusation against him, rendering her unavailable for cross examination on the allegations underlying the charges he faced. For this proposition, Butler relies on the Second District's decision in *People v. Learn*, 396 Ill. App. 3d 891 (2009).

¶ 37    In *Learn*, a five-year-old victim only answered a few basic questions on direct examination about her family. *Id.* at 896. It took several questions for her to acknowledge that her uncle, the defendant, even existed. *Id.* She said she did not like him but could not say why. *Id.* The victim also said she did not remember the occasion when she told her father that the defendant had abused her. *Id.* She acknowledged going to a police station but said she did not answer any questions. *Id.*

The victim then began crying on the stand. *Id*. After a break, defense counsel only asked the victim five questions about the defendant. *Id*. at 897. She answered "I don't know" to most questions and "no" to whether she had ever told her dad anything about the defendant. *Id*.

¶ 38    The trial court found that the victim had testified and then allowed the victim's father and two police officers to each testify to the victim's out-of-court statements describing the defendant sexually abusing her. *Id*. at 896-97. The appellate court found that admission of their testimony as substantive evidence was error. *Id*. The court reasoned that the victim did not testify for purposes of section 115-10 or the confrontation clause since she "did not testify at all about the charge in this case and barely acknowledged the people and places about which she was questioned. She did not 'bear testimony' against defendant. She neither made accusations nor gave relevant and material testimony." *Id*. at 900. The court stated "[i]f the child is the only witness (other than hearsay reporters) who can accuse the defendant of actions constituting the charged offense, the child *must* testify and accuse if she is to be considered to have testified at the proceeding." (Emphasis in original.) *Id*. Thus, the *Learn* court interpreted section 115-10 and the confrontation clause to require that a witness give accusatory, incriminating testimony against the defendant to admit evidence of their out-of-court statements.

¶ 39    Here, Butler similarly argues that K.P.'s testimony was not accusatory and therefore, following *Learn*, the trial court erroneously admitted her out-of-court statements. We disagree and find that K.P. testified at trial for purposes of section 115-10. We agree with the Fifth District's observation that *Learn* does not reflect the current state of Illinois law on this issue. *People v. Graves*, 2021 IL App (5th) 200104, ¶ 41. *Learn* is alone in holding that a victim must testify and accuse the defendant of the charged conduct to satisfy the testimony requirement of section 115-10. Since *Learn* was decided 15 years ago, no court has cited it approvingly, the decision has received

extensive negative treatment, and the Second District has distanced itself from it. See *id.* ¶ 39 (collecting cases). We likewise decline to follow *Learn*.

¶ 40    Instead, we join the majority of Illinois courts and find that the testimony requirement of section 115-10 requires no more than the witness's availability for cross examination—the same requirement to satisfy the confrontation clause. *Id.* ¶ 41. So long as a witness appears for cross examination, the confrontation clause does not require that a witness testify to the substance of their out-of-court statements for those statements to be admissible. *Id.* ¶ 43 (citing *People v. Smith*, 2019 IL App (3d) 160631, ¶ 31 (quoting *People v. Garcia-Cordoba*, 2011 IL App (2d) 070550-B, ¶ 66)). A witness will be found to have been available for cross examination if the witness was present in court and answered all the questions asked of them by defense counsel. *Dabney*, 2017 IL App (3d) 140915, ¶ 19.

¶ 41    Here, the record demonstrates that K.P. appeared for cross examination. During direct examination, K.P. was initially reluctant or unwilling to answer questions. The majority of her responses were head nods, or she gave no response at all. After breaks and being admonished by the court, K.P. began giving verbal responses. Yet, for most of the salient questions, she responded that she did not remember. In contrast, no reluctance was apparent during her cross examination. She gave meaningful responses to all of defense counsel's questions, including many that pertained to being physically abused, albeit by Roland, not Butler. Indeed, K.P.'s testimony on cross examination aligned with Butler's theory of the case. By eliciting K.P.'s testimony about being beaten and mistreated by Roland, counsel supported his contention that she was untruthful during the VSI and thereby challenged K.P.'s out-of-court statements. It is of no moment that defense counsel did not inquire directly about K.P.'s VSI statements accusing Butler of abuse. The opportunity for cross examination satisfies the appearance requirement, irrespective of how the

defendant chooses to cross examine the witness. *Graves*, 2021 IL App (5th) 200104, ¶ 45. We also observe that nothing prevented counsel from inquiring about K.P.'s VSI statements. *Id.* (observing defense counsel could have questioned child victim about out-of-court allegations even though victim did not testify to the charged conduct). *Id.*

¶ 42    For these reasons, we conclude that K.P.'s testimony satisfied section 115-10 to make her out-of-court interview admissible. Thus, the trial court did not abuse its discretion by admitting the VSI. In addition, Butler's confrontation rights were not violated since K.P. was available for cross examination. Accordingly, admission of the VSI complied both with section 115-10 and the confrontation clause. Having found that the VSI was admissible under section 115-10, we need not address the parties' contentions regarding whether the VSI was admissible under section 115-10.1 (730 ILCS 5/115-10.1 (West 2018)) as a prior inconsistent statement.[3]

¶ 43                        B. *Ineffective Assistance*

¶ 44    Butler next argues that his trial counsel was ineffective for failing to request that the jury not view portions of K.P.'s interview in which she discussed bad acts committed by other people. Specifically, he contends portions related to Roland beating K.P., sexual abuse by her cousin and other brother, and K.P.'s admissions to abusing her sisters should have been excluded. Statements on those topics were outside the scope of section 115-10, he contends, and enabled the jury to convict him based on suffering inflicted on K.P. by others.

¶ 45    The State responds that Butler cannot complain about the interview being played in its entirety since he expressly consented to this strategy. We agree. Illinois courts have repeatedly held "[w]here a defendant knowingly and intelligently consents to defense counsel's strategy, he

---

[3]See *People v. Vannote*, 2012 IL App (4th) 100798, ¶ 26 (finding a child victim's out-of-court statements were admissible as prior inconsistent statements when victim claimed not to remember anything at trial).

normally cannot claim ineffective assistance of counsel for the actions of defense counsel in furtherance of that strategy." (Internal quotation marks omitted.) *People v. Bell*, 2021 IL App (1st) 190366, ¶ 107. Here, defense counsel stated expressly that it was Butler's wish that the jury see the entire interview. Butler confirmed so when asked by the court directly. On appeal, he offers no basis to find that he did not knowingly or intelligently consent to this strategy.

¶ 46    In addition, when reviewing a claim of ineffective assistance, courts are to indulge a strong presumption that the challenged action or inaction was the product of sound trial strategy. *People v. Wilkerson*, 2016 IL App (1st) 151913, ¶ 46. The record supports that having the jury view the interview in full was consistent with the defense's strategy. Defense counsel argued that K.P. falsely accused Butler in her interview because she had been badly beaten by her father days before, when he accused her of abusing his other daughter. To support that theory, defense counsel elicited testimony from both K.P. and her mother on these matters. The portions of K.P.'s interview giving a consistent account corroborated their testimonies. Thus, having the jury view the interview in full was in accord with the defense's strategy. Ultimately, the jury was unconvinced, but that alone does not require us to find the strategy unsound. *People v. Massey*, 2019 IL App (1st) 162407, ¶ 31.

¶ 47    Further, Butler cannot show a reasonable probability of a different outcome had the jury viewed a redacted interview. See *People v. Domagala*, 2013 IL 113688, ¶ 36 (defendant must show he was prejudiced by counsel's performance—a reasonably probability that the result of the proceeding would have been different). Butler's claim of prejudice is highly speculative. His claim is also undermined by the fact that much of the same information was introduced at trial through K.P.'s and T.P.'s testimonies.

¶ 48    C. *Jury Instruction*

¶ 49 Next, Butler argues that the trial court should have instructed the jury regarding evidence of his statements. Detective Barclay testified that Butler admitted during questioning that K.P. was his sister and he had babysat her. The instruction Butler's believes the court should have given reads as follows:

"You have before you evidence that the defendant made statements relating to the offenses charged in the indictment. It is for you to determine whether the defendant made the statements, and, if so, what weight should be given to the statements. In determining the weight to be given to a statement, you should consider all of the circumstances under which it was made." Illinois Pattern Jury Instructions, Criminal, No. 3.06-3.07 (approved Oct. 17, 2014).

¶ 50 Butler acknowledges that he forfeited this issue since he failed to request that the instruction be given or otherwise object to the adequacy of the jury instructions before the trial court. He requests that we review the claim under plain error.

¶ 51 "Under the plain error doctrine, a reviewing court may address a forfeited claim in two circumstances: '(1) where a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error and (2) where a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Hood*, 2016 IL 118581, ¶ 18 (quoting *People v Belknap*, 2014 IL 117094, ¶ 48).

We must first determine whether error occurred at all. *Id.* "[W]ithout error, there can be no plain error." *Id.*

¶ 52   A trial court generally has no obligation to instruct a jury on its own motion. *People v. Koen*, 2014 IL App (1st) 113082, ¶ 46. Rather, "the only situations where a fair trial requires the court to *sua sponte* offer an instruction include seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." (Internal quotation marks omitted.) *People v. Wright*, 2017 IL 119561, ¶ 88. When an instruction involves none of those issues, a court's failure to *sua sponte* tender it is not error. *People v. Franklin*, 135 Ill. 2d 78, 103 (1990); *People v. Turner*, 128 Ill. 2d 540, 562-63 (1989). The instruction Butler argues the court should have given does not bear on the essential issues of "the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." Therefore, there was no error and Butler cannot demonstrate plain error.

¶ 53   Alternatively, Butler claims that trial counsel's failure to request the instruction amounts to ineffective assistance. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36. If the defendant suffered no prejudice, we need not consider whether counsel's performance was deficient. *People v. Griffin*, 178 Ill. 2d 65, 74 (1997). Prejudice is shown when there is a reasonable probability, but for counsel's deficient performance, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36.

¶ 54   Here, we cannot conclude that Butler was prejudiced by the failure to request the jury instruction regarding his pretrial statements. The only pretrial statements attributed to Butler were admissions that K.P. was his sister and that he babysat her. These admissions were not incriminating, and it is unreasonable to believe that instructing the jury to determine whether he made them and under what circumstances would have affected their deliberation. To be sure, the

admissions were basic, undisputed background information. That Butler and K.P. were siblings was uncontestable. Both K.P. and T.P. testified that Butler and K.P. were siblings who resided in the same home. Although the State referenced Butler's admission that he babysat K.P., this was far from incriminating. From common experience, jurors would expect that older siblings would be placed in charge of younger siblings on occasion.

¶ 55    Further, IPI Criminal 3.06-07 was inapplicable. By its terms, the instruction is relevant when there is a question of fact as to whether a defendant made a statement or whether such a statement is true. Although evidence of Butler's statements was introduced and the State mentioned it in argument, whether he made the statements, and their truth or falsity were not at issue in the case. Under these circumstances, we fail to see how the instruction could have made a difference. Accordingly, Butler cannot show that he was prejudiced, and his ineffective assistance claim necessarily fails.

¶ 56                          D. *Closing Arguments*

¶ 57    Lastly, Butler argues that he was deprived of a fair trial by prosecutorial misconduct in closing arguments. He claims various comments were improper and each comment prejudiced him, or prejudice resulted from their cumulative effect. Specifically, Bulter contends: (1) the State improperly bolstered the credibility of K.P.'s VSI statements by vouching for Alstott's ability as an interviewer, (2) the prosecutor misstated the law by telling the jury that K.P.'s VSI was "just as if that 9-year-old girl was up on the witness stand, and Ali Alstott was the lawyer asking her questions," (3) the prosecutor improperly blamed Bulter for the beating she suffered from her father, (4) the prosecutor improperly referenced abuse of K.P. committed by others so as to suggest Butler's guilt by association, and (5) certain comments were unduly inflammatory, including

calling Butler "Mr. Despicable" and saying that he "taught a little girl how to suck his private part and how to bend over furniture and take it in the rear end."

¶ 58     Butler included the claimed improper remarks in his motion for new trial. However, he objected to none of them at trial. To preserve an issue for appeal, a defendant must both make a contemporaneous objection at trial and raise the specific issue in a posttrial motion. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 81. Butler's failure to object results in forfeiture of this claim. *Id*. In his reply brief, however, he contends the prosecutor's comments amount to plain error under the first prong. See *supra* ¶ 49. A defendant's argument for plain error in a reply brief "is sufficient to allow us to review the issue for plain error." *People v. Ramsey*, 239 Ill. 2d 342, 412 (2010). Thus, we consider whether a clear or obvious error occurred.

¶ 59     To obtain relief on an unpreserved error under the plain-error doctrine, the same error must entitle the defendant to relief if it had been preserved. *People v. Williams*, 2022 IL 126918, ¶ 49. For a prosecutorial comment in closing argument to be reversible error, the comment must be both improper and substantially prejudicial. *Id.* Prosecutors are afforded wide latitude in closing argument. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). The prosecutor "may comment on the evidence and any reasonable inferences that arise from it, even if those inferences reflect negatively on the defendant." *Williams*, 2022 IL 126918, ¶ 44. Prosecutors may also comment on matters implicated by defense counsel. *Id*. We consider the comments in closing argument in context of the entire closing argument of both the State and defendant. *People v. Ceja*, 204 Ill. 2d 332, 357 (2003).

¶ 60                              1. Vouching for K.P.'s credibility

¶ 61     We first consider the prosecutor's remarks regarding Alstott. Butler points to these comments:

"You didn't hear one leading question out of Ali. Who, what, where, when, why, how. She didn't say, 'isn't [it] true that this happened, or this happened;' correct? No. There's an art to it. She's trained. Because you're trained to get the truth by asking those questions."

Butler argues that the prosecutor improperly vouched for Alstott as a good interviewer and, by extension, vouched for K.P.'s credibility.

¶ 62     We do not find the challenged remarks improper. Alstott testified to her qualifications, including her education, training, and experience conducting interviews of children regarding abuse. She also described using questioning techniques that avoid suggesting answers, including using open-ended questions, and her use of those techniques was evident from the video, which was played in its entirety. Alstott also testified that she had not reviewed any reports related to K.P. or her family before interviewing her. Thus, the prosecutor's suggestion that Alstott was a trained interviewer, and her training is designed to yield truthful statements were reasonable inferences based on the evidence.

¶ 63     Further, the prosecutor did not vouch for Alstott ability or K.P.'s credibility. A prosecutor improperly vouches for a witness's credibility when they either (1) "convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury;" or (2) "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." (Internal quotation marks omitted.) *People v. Williams*, 2015 IL App (1st) 122745, ¶ 13. Here, the prosecutor neither conveyed an impression that they knew something about Alstott's interviewing ability that was not presented in evidence nor suggested that the jury should find K.P.'s interview statements credible based on the prosecutor's opinion of Alstott. In addition,

the prosecutor made no statement in the form of an opinion, which is generally required for us to consider the statement an improper opinion. See *People v. Pope*, 284 Ill. App. 3d 695, 707 (1996) (observing that improper expressions of opinion generally include explicit language such as "I believe" or "I think").

¶ 64                                    2. "Just as if"

¶ 65        Next, Butler complains that the prosecutor misstated the law when discussing K.P.'s VSI with the following comment: "It's just as if that 9-year-old girl was up on the witness stand, and Ali Alstott was the lawyer asking her questions." Butler contends the comment erroneously equated out-of-court testimony, where the declarant is not under oath or subject to cross examination, with in-court testimony.

¶ 66        In context, the prosecutor was explaining that K.P.'s VSI could be considered as substantive evidence despite K.P. not testifying consistent with it at trial. The relevant portion of argument was as follows:

> "You're also going to get an instruction that starts out talking about the believability of witnesses. And part of that instruction *** says: However, you may consider a witness's earlier inconsistent statement as evidence without this limitation ***.
>
> What does that mean? *** that means *** when you watch that forensic interview of [K.P.] when she was 9 years old. It's just as if that 9-year-old girl was up on the witness stand, and Ali Alstott was the lawyer asking her questions. You can consider that as substantive evidence in this case. You can consider that."

The limitation the prosecutor referred to, which was stated in the jury instructions, is that prior inconsistent statements ordinarily may only be considered for the limited purpose of determining how much weight to give a witness's in-court testimony. Illinois Pattern Jury Instructions,

Criminal, No. 3.11 (IPI 3.11) (approved Oct. 17, 2014). After these statements, the prosecutor went on to offer reasons that the jury should believe what K.P. said in the VSI.

¶ 67　　　Thus, the context demonstrates that the import of the complained of comment was that the jury could consider K.P.'s VSI statements as substantive evidence. That was a correct statement of law. *Id.*; 725 ILCS 5/115-110.1 (West 2018). The statement did not equate a prior inconsistent statement with in-court testimony in the manner Butler contends. It was not directed at the credibility of the VSI statements, as the prosecutor addressed that question separately. In any event, the court gave the jury proper instructions on how to evaluate the VSI, which generally cures any prejudice resulting from improper remarks. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). In sum, we find no clear or obvious error resulting from the "just as if" comment.

¶ 68　　　　　　　　　　　　3. Blaming Butler for Roland Beating K.P.

¶ 69　　　We next consider Butler's challenge to these remarks:

> "What's more ridiculous is he's the reason she got that beating. She told you on that forensic interview, her dad was beating on her because she was touching on her little sisters, and her brothers were touching on her. Where did she learn that? Where do little siblings learn things? From their parents and from their older siblings, they mimic them, they copy them."

Butler argues the comment blamed him for the beating K.P. received from Roland, making him responsible for a separate crime from those charged.

¶ 70　　　We note that the complained of remarks were made in rebuttal. Defense counsel first introduced the theory that Roland beat K.P. because Roland believed that someone had taught K.P. to perform sex acts on younger siblings and Roland wanted K.P. to identify that person:

"[K.P.] was a prisoner for what she had done; [Roland] wanted to know why she's doing this; he believed that if she had done this thing, someone had shown her how to do it. And that's why she's doing it. 'And tell me who told you how – [who] showed you how to do this?' And she came up with names, including *** Sidney Butler."

Further, in the VSI, K.P. described being subjected to sexual acts by Butler and others before she performed acts on her younger sisters. Thus, it was reasonable for the prosecutor to draw an inference that K.P.'s abuse of her younger sisters resulted from the abuse she suffered from Butler. For these reasons, we find that the remarks were both invited and a reasonable inference from the evidence.

¶ 71                                4. Guilt by Association

¶ 72        Similarly, Butler complains about this comment in rebuttal: "[K.P.] was in a perfect storm. She was a little ship in a perfect storm, and that perfect storm was [Butler]; his brother; his cousin; her father; her mother. That's what she was living." He argues that the prosecutor made him the "scapegoat" for the abuse K.P. suffered from other family members and asked the jury to find him guilty by association rather than for his own conduct.

¶ 73        Like the prior issue, defense counsel first commented on K.P. being abused. He also argued T.P. had contributed to the abuse by failing to act when K.P. was kept in the basement for days after Roland had beaten her. Defense counsel asked the jury to credit K.P.'s testimony over T.P.'s denials and claim she had taken K.P. to the hospital the same day. Also, the comment was based on K.P.'s VSI, which described abuse from multiple family members. Thus, we do not find the comment improper.

¶ 74                                5. Inflammatory Remarks

¶ 75    Last, Butler claims the prosecutor made prejudicial inflammatory remarks by referring to him as "Mr. Despicable" and stating, "Instead of teaching [K.P.] how to read and write her ABCs or how to tie her shoes, [Butler] taught [K.P.], a little girl, how to suck his private part and how to bend over furniture and take it in the rear end." "[I]nflaming of the jury's passions is not directly barred; rather any commentary that does so must also serve a different proper purpose." *People v. Darr*, 2018 IL App (3d) 150562, ¶ 71. Argument that serves no purpose but to inflame the jury is improper. *People v. Blue*, 189 Ill. 2d 99, 128 (2000). We address each comment in turn.

¶ 76    We observe that defense counsel first used the word "despicable" when stating, "If you find that [Butler] did that beyond a reasonable doubt, by all means find him guilty because people that abuse children are despicable." In rebuttal, the prosecutor stated: "the Defendant, through his attorney, just got up here and said, 'anybody who would do that is despicable.' Well, ladies and gentlemen, let me introduce you to Mr. Despicable here. Because that's what he did, and that's what we showed you he did." Accordingly, the "Mr. Despicable" comment was a permissible response.

¶ 77    The other comment, by contrast, was made near the beginning of the prosecutor's initial argument. Later, the prosecutor recounted portions of the VSI:

> "[K.P.] indicated that [Bulter] told her to suck his private part. She also indicated that [Bulter] tried to put his private part into her butt, and it hurt.
>
> She demonstrates how [Butler's] body was positioned when he tried to put it into her butt, and she demonstrates a humping motion. She demonstrates how her body was positioned. She turns over and sticks her backside up, and demonstrates how her body is bending over furniture."

This was an accurate description of the VSI. K.P. described sex acts Butler, her older brother, subjected her to beginning when she was age four. She used the words "suck his private part" and physically demonstrated by, *inter alia*, bending forward at the waist. Thus, the earlier comment was based on the evidence.

¶ 78    Nevertheless, we fail to see a purpose served by the "take it in the rear end" comment other than inflaming the passions and prejudices of the jury. The comment offered no reason as to why the evidence proved Butler had committed the charged offenses. Instead, the prosecutor's remarks were aimed at generating sympathy for K.P. and outrage at Butler. He emphasized her young age and vulnerability by referencing learning to read or tie shoes and the depravity of the charged conduct by using the crude phrase "take it in the rear end."

¶ 79    Although we find the comment improper, we do not believe it was so substantial as to constitute error. To be sure, the trial evidence was evocative on its own. So, the prosecutor's comment was not as shocking as it may seem outside of its context. The jury had already been exposed to disturbing material, including the VSI and testimony about K.P. being beaten by Roland. Thus, by the time of closing arguments, we do not believe the prosecutor's comment caused the jury to act upon inflamed passions instead of the evidence. In addition, the remark was brief and isolated among lengthy arguments. See *People v. Jackson*, 2020 IL 124112, ¶ 87 (noting that the brief and isolated nature of remarks in context is a factor in assessing the effect on the jury verdict).

¶ 80    Having found no reversible error in the closing arguments, we find no plain error.

¶ 81                                III. CONCLUSION

¶ 82    Based on the foregoing, we affirm the judgment of the circuit court.

¶ 83    Affirmed.